AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of Ohio

FILED
RICHARD L NAGEL
CLERK OF COURT

18 JAN 30 PM 6:05

U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST DIV CINCINNATI

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

6580 Lakota Pointe Lane, Liberty Township, OH 45044

)
)
)
)
)
)

Case No.

1:18 M J - 64

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____Southern_____ District of _____Ohio_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841a1 and 846 | Conspiracy to Distribute and Distribution of Controlled Substances |

The application is based on these facts:

See Attached Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Joseph Zevchek, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1/30/18 @ 6:02 pm

_____
*Judge's signature*

City and state: Cincinnati, Ohio

Hon. Karen L. Litkovitz, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**

**AN APPLICATION FOR SEARCH WARRANTS**

I, Joseph J. Zevchek, being duly sworn, hereby depose and say:

1. I am a Special Agent with the Drug Enforcement Administration (DEA), and have been so assigned since October of 2015. During the course of your affiant's law enforcement career, your affiant has received training in the utilization, preparation, and execution of search and seizure warrants at the Drug Enforcement Administration Training Academy, and has subsequently participated in the execution of numerous search and seizure warrants for narcotics, dangerous drugs, and the records, books, and proceeds derived as a result of violations of the State and Federal narcotics statutes.

2. This affidavit is submitted in support of an application for search warrants for evidence, contraband, fruits and instrumentalities of a conspiracy to manufacture, possess with intent to distribute, and distribute heroin.

3. As outlined below, I have probable cause to believe that evidence related to these crimes will be located within the following Subject Locations as more fully described in **Attachment A**, which is attached hereto and incorporated herein by reference:

a. **Subject Location – 1828 Augusta Boulevard:** **1828 Augusta Boulevard, Fairfield, Ohio** (hereafter referred to as **Subject Location – 1828 Augusta**), the primary residence of Armando GONZALEZ-ROSAS. GONZALEZ-ROSAS is a mid-level heroin dealer in the greater Cincinnati Area.

b. **Subject Location – 6580 Lakota Pointe:** **6580 Lakota Pointe Lane, Liberty Township, Ohio, 45044** (hereafter referred to as **6580 Lakota Pointe**), the primary

1

residence of Felix GARCIA-ROSAS, who operates as a courier and driver for the MONROY-CUADROS Drug Trafficking Organization (DTO).

c. **Subject Location – 5774 Gilmore Drive:** **5774 Gilmore Drive, Fairfield, Ohio** (hereafter referred to as **5774 Gilmore**), the primary residence of Miguel MONROY-CUADROS, a mid-high level heroin dealer in the Cincinnati area.

d. **Subject Location – 2850 Oxford-Trenton Road:** **2850 Oxford-Trenton Road, Oxford, Ohio** (hereafter referred to as **2850 Oxford-Trenton**)**,** a stash house used by the MONROY-CUADROS DTO as well as the primary residence of Omar SANTOS, a courier and distributor for the DTO.

## CASE BACKGROUND AND ACQUISITION OF ONE OUNCE OF HEROIN

4. In August 2017, DEA Cincinnati began an investigation into Armando GONZALEZ-ROSAS and his drug trafficking activities. This drug trafficking organization (DTO) is believed to be responsible for distributing ounce and kilogram quantities of heroin and cocaine in the Cincinnati, Ohio area. GONZALEZ-ROSAS is believed to be a distributor in this organization with access to large quantities of narcotics to distribute to other lower-level dealers.

5. Early in the investigation, agents directed a confidential source (CS-1) to make contact with GONZALEZ-ROSAS and gain information about his drug-trafficking activities. CS-1 was cooperating for consideration in criminal charges, but has since been cooperating for financial gain. CS-1 has provided information that has proven to be reliable and credible in this investigation and others that have resulted in arrests and the seizure of controlled substances. I believe CS-1 to be reliable.

6. On September 7, 2017, at approximately 6:30 p.m., DEA established surveillance at the Home Depot, located at 6562 Winford Avenue, Hamilton, Ohio, in anticipation of a controlled purchase of heroin which had been arranged earlier in the day by CS-1 through Armando GONZALEZ-ROSAS. CS-1 also told investigators that GONZALEZ-ROSAS would be sending his cousin in a red truck to deliver the drugs. Additionally, GONZALEZ-ROSAS stated that the transaction was to occur in the Home Depot parking lot near the contractor's entrance.

7. At approximately 6:46 p.m., DEA observed a red Dodge truck, bearing Ohio license GZG8577 arrive at the Home Depot and park near the contractor's entrance. The driver of the red truck was subsequently identified through computer checks as Felix GARCIA-ROSAS. Computer checks also revealed the registered owner of this truck is Sumiko B. Sanchez; address: 1014 Edison Avenue, Hamilton, Ohio 45011. Sanchez has been identified as the girlfriend of GARCIA-ROSAS.

8. At approximately 6:53 p.m., CS-1 arrived at the Home Depot and parked near the red truck. Prior to being sent to the meet location, CS-1 and his/her vehicle were searched by DEA and CS-1 was provided with $1,700.00 recorded currency and an audio/video recording device.

9. Upon arrival, CS-1 exited his/her vehicle and walked to the waiting red truck, entering its passenger side front door.

10. At approximately 6:55 p.m., CS-1 exited the vehicle and returned to his/her own and departed. CS-1 then responded to a predetermined meet location and provided law enforcement personnel with approximately one ounce of heroin purchased from GONZALEZ-ROSAS and delivered by GARCIA-ROSAS.

11. On October 4th, 2017, Judge Michael R. Barrett of the Southern District of Ohio signed an order authorizing the interception of wire communications over telephone number 513-212-4793 (hereinafter TC-1), known to be used by Armando GONZALEZ-ROSAS.

### Subject Locations-1828 Augusta and 6580 Lakota Pointe

12. On September 4, 2017, a State of Ohio Search Warrant was obtained for the installation of a GPS tracker on the black Dodge truck bearing Ohio registration GTU5191 driven by Armando GONZALEZ-ROSAS. This vehicle is registered to Marisa CULVERT-GONZALEZ at **1828 Augusta Boulevard, Fairfield, Ohio**.

13. On September 11, 2017, the GPS unit was successfully installed on the black Dodge truck GTU5191.

14. Analysis of the tracker data and spot checks conducted by DEA throughout this investigation have revealed that the black Dodge truck GTU5191 is parked overnight on most days at **1828 Augusta**.

15. On September 11, 2017, a State of Ohio Search Warrant was obtained for the installation of a GPS tracker on the red Dodge truck driven by Felix GARCIA-ROSAS.

16. On September 13, 2017, the GPS unit was successfully installed on the red Dodge truck.

17. Analysis of the tracker data and spot checks conducted by DEA throughout this investigation have revealed that the red Dodge truck bearing Ohio registration GZG8577 is parked overnight on most days at **6580 Lakota Pointe**.

18. Utility checks on **6580 Lakota Pointe** showed that on June 27, 2017, service for both gas and electric was activated by Duke Energy. Sumiko SANCHEZ is the listed Duke Energy customer at the Lakota Pointe address. Reference is directed to paragraph 7, where Sumiko SANCHEZ is also the registered owner of the red Dodge truck.

19. I am aware, based on his training and experience, that people who engage in drug trafficking go to great lengths to conceal their identity. One of the ways this is accomplished is through the registration of vehicles in the name of a different person who doesn't primarily utilize the vehicle. Neither Marisa CULVERT-GONZALEZ nor Sumiko SANCHEZ are the primary users of the above-referenced vehicles.

20. On October 24, 2017, following coordination calls between Armando GONZALEZ-ROSAS over TC-1 and Miguel MONROY-CUADROS at (513) 978-7387, investigators established surveillance on GOZALEZ-ROSAS in anticipation of a meet between GONZALEZ-ROSAS and MONROY-CUADROS. Based on the telephone calls, during this meet MONROY-CUADROS agreed to provide GONZALEZ-ROSAS with an unspecified quantity of currency.

21. Following additional coordination calls between the two, GONZALEZ-ROSAS indicated on the phone that he was at MONROY-CUADROS' residence, 5774 Gilmore Avenue, Fairfield, Ohio. On the call GONZALEZ-ROSAS requested to be allowed entry. Simultaneously, DEA observed GONZALEZ-ROSAS standing on the front porch of 5774 Gilmore Drive, Fairfield, Ohio. Shortly thereafter, GONZALEZ-ROSAS entered the residence.

22. At approximately 5:09 p.m., DEA observed GONZALEZ-ROSAS exit the residence and depart.

23. Prior to leaving, GONZALEZ-ROSAS made arrangements via telephone to meet Felix GARCIA-ROSAS at the PNC Bank near Applebee's.

24. Investigators maintained surveillance of GONZALEZ-ROSAS as he made a short stop at his residence at **1828 Augusta** and then on to the PNC Bank at 5333 Pleasant Avenue, Fairfield, Ohio, where agents observed GONZALEZ-ROSAS and Felix GARCIA-ROSAS meet in the parking lot at approximately 5:27 p.m. GARCIA-ROSAS was already present in a silver Dodge Durango bearing Ohio license HER5460.

25. After a short meeting in GONZALEZ-ROSAS' truck, Felix GARCIA-ROSAS returned to his own vehicle and GONZALEZ-ROSAS entered the bank.

26. Upon exiting the bank, GONZALEZ-ROSAS and GARCIA-ROSAS met again briefly and then both parties departed. Based on the surveillance observation and intercepted calls, I believe that GONZALEZ-ROSAS picked up drug proceeds from MONROY-CUADROS, stopped at his residence, located at 1828 Augusta Boulevard, Fairfield, Ohio, in order to drop off and store a portion of those proceeds there, and then traveled to the PNC bank in order to deposit the remaining portion of those drug proceeds.

27. On November 11, 2017, Armando GONZALEZ-ROSAS placed an outgoing phone call to Cesar SANCHEZ at (513) 485-1815. During the call, SANCHEZ asked GONZALEZ-ROSAS if he had the "material." GONZALEZ-ROSAS stated "that's all on hand" and "there at Home Depot they want to sell some as well." Later, GONZALEZ-ROSAS made a coordinating call to SANCHEZ which indicated that SANCHEZ was going to meet GONZALEZ-ROSAS at GONZALEZ-ROSAS' house

located at **1828 Augusta**.

28. On November 12, 2017, at approximately 11:11 a.m., GONZALEZ-ROSAS received an incoming call from SANCHEZ. During the call, GONZALEZ-ROSAS stated he was waiting for SANCHEZ. SANCHEZ then stated he would drop by within one hour. At approximately 12:31 p.m., GONZALEZ-ROSAS placed an outgoing call to SANCHEZ. During the call, SANCHEZ indicated that he was at the Home Depot. GONZALEZ-ROSAS stated that he had "three pieces of...the same color." SANCHEZ told him "bring like three, buddy." GONZALEZ-ROSAS confirmed and said he could. I believe the conversation in paragraphs 27 and 28 above refers to a meeting concerning an illegal narcotics deal, as further amplified below.

29. Shortly after the above, GONZALEZ-ROSAS received an incoming call from Felix GARCIA-ROSAS. This call is transcribed below:

> **GONZALES-ROSAS:**     **Hello.**
> **FELIX GARCIA-ROSAS:** **Hello, what's going on?**
> **GONZALES-ROSAS:**     **Just head over to the house, boy.**
> **FELIX GARCIA-ROSAS:** **Alright, then.**

30. Due to the received calls, I believe that GONZALEZ-ROSAS was directing GARCIA-ROSAS to come to GONZALEZ-ROSAS' house at **1828 Augusta** to pick up a sample of heroin. I know based on experience and training that individuals who purchase larger quantities of heroin typically seek to obtain a sample to check the quality before they actually complete the purchase. I believe that on November 11, 2017, SANCHEZ contacted GONZALEZ-ROSAS to ask if he had any heroin ("material") available. On the next day, GONZALEZ-ROSAS and SANCHEZ had another telephone conversation during which GONZALEZ-ROSAS told SANCHEZ that he (GONZALEZ-ROSAS) has "three pieces of... the same color". I believe that

when GONZALEZ-ROSAS said "three pieces of…the same color" he was telling SANCHEZ that the quantity of "three" (believed to be "three ounces") that GONZALEZ-ROSAS possesses has the same quality as the sample that SANCHEZ appeared to have obtained the previous day.

31. The subsequent call to Felix GARCIA-ROSAS, I believe, was in order to have GARCIA-ROSAS, as he has done previously, perform the delivery of the suspected heroin to SANCHEZ. Thus, in order to deliver the drugs to SANCHEZ, Felix GARCIA-ROSAS had to go meet GONZALEZ-ROSAS at his house located at **1828 Augusta**. Accordingly, at approximately 1:30 p.m., on November 12, 2017, DEA established surveillance near **1828 Augusta**.

32. At approximately 2:14 p.m., agents observed a red Dodge pickup bearing Ohio registration GZG8577, known to be used by GARCIA-ROSAS, pull in front of the house. GARCIA-ROSAS was observed entering the front door of **1828 Augusta**.

33. At approximately 2:17 p.m., DEA observed GARCIA-ROSAS run from the front of the attached garage and around the back of the residence. GARCIA-ROSAS emerged after a moment, entered his truck, and departed southbound on Augusta. Agents then observed that GARCIA-ROSAS' girlfriend and child were in the vehicle as well.

34. Surveillance was maintained on GARCIA-ROSAS as he traveled north on State Route 4 after departing from GONZALEZ-ROSAS' residence. GARCIA-ROSAS was then observed pulling into the parking lot of El Valle Verde restaurant at 2444 Dixie Highway in Fairfield, Ohio.

35. After parking his vehicle, GARCIA-ROSAS got out of the red Dodge truck and went inside the restaurant by himself for approximately two minutes. GARCIA-ROSAS

then got back into his car, departed the area and surveillance observed the truck eventually arrive at 1014 Edison Avenue, Hamilton, Ohio. Electronic and physical surveillance determined that shortly thereafter, the truck travelled to the Wal Mart at 3201 Hamilton Princeton Road in Hamilton, Ohio.

36. At Wal-Mart GARCIA-ROSAS went inside the store with his wife and child. Surveillance inside the store did not see him meet with anyone.

37. Based on the above, I believe that GARCIA-ROSAS was directed to stop over at the residence of GONZALEZ-ROSAS at **1828 Augusta Boulevard** in order to pick up the suspected three ounces of heroin for delivery to the restaurant. The telephone call, in addition to the brief stops at both the residence of GONZALEZ-ROSAS and the restaurant are conduct common of individuals engaged in the trafficking of drugs. Individuals engaged in drug trafficking typically have short meetings with their customers in order to minimize the risk of detection by law enforcement.

38. Based on the intercepted conversations and surveillance mentioned above, as well as later in this affidavit, I believe that Felix GARCIA-ROSAS is a facilitator for the DTO. Based on my training and experience, individuals engaged in the sale of drugs will sometimes utilize other people to deliver drugs or pick up money, as in this case. Doing so allowed GONZALEZ-ROSAS and MONROY-CUADROS to minimize the risk of direct law enforcement contact. Your affiant is also aware that a dealer is most at risk of danger or arrest when they are actually physically handling drugs or money, thus facilitators are utilized.

39. Your affiant also knows that these individuals who assist in the facilitation of the movement of drugs or money are usually paid for taking such risks. Trusted

facilitators can also stash product for "bosses" at their residence in order to minimize the amount of times these individuals meet. Facilitators may also retain illegal narcotics which are low in quality and need to be returned. These individuals, based on my training and experience, also tend to keep monies and other evidence of their role in the conspiracy at their residence(s).

40. Based on the physical and electronic surveillance listed above, including the suspected drug transaction in paragraphs 27-35, I believe that GONZLEZ-ROSAS lives at **1828 Augusta**, and GARCIA-ROSAS lives at **6580 Lakota Pointe**, and that they utilize those locations in furtherance of the illegal activities of the DTO by storing drugs and drug proceeds there.

### Subject Location: 5774 Gilmore Drive

41. During the course of intercepting wire communications over TC-1, agents discovered that GONZALEZ-ROSAS' source of supply was Miguel MONROY-CUADROS. CUADROS is married to Annel REYES-VALDES, who has been identified as a nominee owner of vehicles, apartments and telephones in previous DEA Cincinnati investigations that have resulted in the seizure of money and drugs. MONROY-CUADROS was first identified in the immediate investigation discussed in this affidavit. As outlines below, during the investigation, agents have identified several of MONROY-CUADROS' coconspirators, to include Omar SANTOS and Armando REYES. Based on intercepted conversation, physical surveillance and electronic surveillance I believe that SANTOS and REYES work as distributors for MONROY-CUADROS. During the period of investigation, agents have also intercepted numerous conversations among coconspirators referring to WhatsApp, a web based

messenger service, as well as additional telephones used by the coconspirators. I believe that the DTO used WhatsApp and additional phones in order to coordinate the majority of their drug trafficking activities. Since agents are unable to intercept WhatsApp messages nor have they been able to determine additional phone numbers used by the DTO, they have not been able to interdict any quantity of narcotics. However, as agents have intercepted numerous calls that they believe are related to drug trafficking, observed conduct common to drug trafficking among these individuals, and made two money seizures totaling over $140,000, I believe that, as described further below, probable cause exists to search the target locations.

42. Through surveillance and computer checks, agents determined that MONROY-CUADROS and REYES-VALDES reside at **5774 Gilmore Drive, Fairfield, Ohio**.

43. On November 8, 2017, Judge Michael R. Barrett of the United States District Court for the Southern District of Ohio signed an order authorizing the continued interception of wire communications over TC-1, and the initial interception of wire communications over (513) 978-7387 (hereinafter TC-2), known to be used by Miguel Angel MONROY-CUADROS.

44. Intercepted communication over TC-2 revealed that GARCIA-ROSAS is also an associate of MONROY-CUADROS.

45. On November 25th, 2017, DEA intercepted the following call between Felix GARCIA-ROSAS and MONROY-CUADROS. The call is transcribed below:

> **FELIX GARCIA-ROSAS: And then?**
> **MONROY-CUADROS: Uh-huh. [CHUCKLES]**
> **FELIX GARCIA-ROSAS: What's the deal?**
> **MONROY-CUADROS: Are you working or what?**
> **FELIX GARCIA-ROSAS: Hum... I'm going later on.**
> **MONROY-CUADROS: Oh yeah, you finished already? Oh...**

[VOICES OVERLAP]
FELIX GARCIA-ROSAS: Yeah.
[VOICES OVERLAP]
MONROY-CUADROS: ...Well then, then that's great.
FELIX GARCIA-ROSAS: Yeah, man.
[VOICES OVERLAP]
MONROY-CUADROS: Hum... hey, uh, we need to go cut, cut some trees and chip over there where you went last time. Do you remember? [PAUSE] Down there.
FELIX GARCIA-ROSAS: Yes.
[VOICES OVERLAP]
MONROY-CUADROS: [COUGHS] so you can schedule yourself. On the 4th, we need to be over there on the 4th.
FELIX GARCIA-ROSAS: Alright.
MONROY-CUADROS: They just informed me, buddy and, and we need to be over there.
FELIX GARCIA-ROSAS: It's set.
MONROY-CUADROS: So you can [U/I] and schedule it. Hum...
FELIX GARCIA-ROSAS: Alright.
[VOICES OVERLAP]
MONROY-CUADROS: ...and it's just that, most likely we sign the contract papers during the day [PAUSE] and at night we have to [STAMMERS] adjust some details of... [PAUSE] how can I explain this? [SNIFFS] [STAMMERS] for some details [STAMMERS] that we have, to...
[VOICES OVERLAP]
FELIX GARCIA-ROSAS: For sure.
MONROY-CUADROS: ...store here, to store all the tools and everything [PAUSE] over there.
[VOICES OVERLAP]
FELIX GARCIA-ROSAS: Uh-huh.
MONROY-CUADROS: So then we are not going to have enough time so I think we are going to stay over there, man.
FELIX GARCIA-ROSAS: Alright then.
MONROY-CUADROS: So you can schedule that. Alright?
FELIX GARCIA-ROSAS: Alright.
MONROY-CUADROS: Alright. Alright then.
FELIX GARCIA-ROSAS: Alright.

46. Agents believe that this call reveals that Felix GARCIA-ROSAS works for both Armando GONZALEZ-ROSAS and for Miguel Angel MONROY-CUADROS. Due to the coded nature of the call, I believe that it is a drug-related conversation. MONROY-CUADROS tells GARCIA-ROSAS that "Hum... hey, uh, we need to go

cut, cut some trees and chip over there where you went last time. Do you remember? [PAUSE] Down there." Later on in the conversation MONROY-CUADROS tells GARCIA that "they just informed me and we need to be over there". When MONROY-CUADROS says "…and it's just that, most likely we sign the contract papers during the day [PAUSE] and at night we have to [STAMMERS] adjust some details of... [PAUSE] how can I explain this? [SNIFFS] [STAMMERS] for some details [STAMMERS] that we have, to…" I believe that he is referring to getting money "contract papers" over to unknown individuals in order to facilitate an eventual shipment of drugs into the Cincinnati area.

47. On December 3, 2017, at approximately 2:34a.m. Felix GARCIA-ROSAS placed an un-monitored telephone call to MONROY-CUADROS. Reference is directed to paragraph #45 where Felix GARCIA-ROSAS was notified of a pending trip, the purpose of which I believe was to conduct drug business. Cellular data obtained from the pen register for this telephone call placed GARCIA-ROSAS close to **5774 Gilmore**. GPS tracker data shows the red Dodge truck driven by GARCIA-ROSAS was in Alabama later that day. The vehicle stopped at a residence for approximately 6 hours, and then travelled to a Ramada Inn in Pelham, Alabama.

48. On the morning of December 4, 2017, GPS data indicated that the truck departed the hotel, travelled to a nearby gas station and truck stop, and then returned to the hotel. Shortly afterward, at approximately 10:44 a.m. EST, agents with DEA Birmingham observed GARCIA-ROSAS carry two Modelo beer cases and place them into the bed of the truck. MONROY-CUADROS was observed shortly afterward coming out of the hotel with a black suitcase, which he placed in the back of the truck. Surveillance

13

was maintained as the vehicle travelled north on I-65 and past Birmingham. Agents then terminated physical surveillance.

49. GPS data indicated that the vehicle stopped in the Louisville, Kentucky area at approximately 4:18 p.m., EST. The vehicle traveled to a restaurant, and began travelling back to the Cincinnati area. At approximately 7:00 p.m., EST, agents observed the vehicle pull into **5774 Gilmore**. MONROY-CUADROS got out of the truck, and took one of the cases of beer and the suitcase into the house. GARCIA-ROSAS then departed the residence.

50. Surveillance was maintained on GARCIA-ROSAS as he departed the residence. Agents then directed Ohio State Highway Patrol troopers to conduct a "wall-off" stop of GARCIA-ROSAS in order to allow a K9 officer to conduct an open-air sniff of the vehicle. The open air sniff was negative. However, troopers saw indications that the vehicle may have been equipped with a gas-tank trap, a device commonly used to conceal drugs and drug proceeds. Your affiant knows, based on training and experience, that such devices are illegal in the State of Ohio. The vehicle was transported to a nearby Highway Patrol Station and a search was conducted. No trap was found. However, in the glovebox of the vehicle was a piece of paper with the phone number (513) 615-3519. Toll analysis revealed that this phone number was primarily in contact only with (937)-313-5017, which was itself in contact with an Alabama-based phone number (205) 436-6657. (205) 436-6657 has since been intercepted in this case discussing what agents believe to be drug trafficking. Based on training and experience, I know that drug traffickers will often purchase or use prepaid, disposable phones for use over a short period of time in order to conceal their

drug trafficking activities. I believe that GARCIA-ROSAS used this phone in furtherance of drug trafficking activities during his trip to Birmingham.

51. I believe that this trip was the one referenced in paragraph 45 of this section. Based on my training and experience, I know that drug traffickers will travel long distances and stay at their destination for short periods in order to conduct drug transactions. I also know, based on training and experience, that truck stops are a common place to conduct large-scale drug transactions, as DTOs frequently employ truck drivers to transport drugs and drug proceeds. As MONROY-CUADROS is not apparently involved in the tree trimming business, nor did GARCIA-ROSAS or MONROY-CUADROS appear to have any tools present, I believe that this trip was related to drug trafficking. Due to the timing of this trip, in conjunction with other calls, I believe that MONROY-CUADROS travelled to Birmingham to arrange or pay for a shipment of narcotics.

52. On December 21, 2017, at approximately 4:46 p.m. MONROY-CUADROS received an incoming phone call from Joanh SILLER, aka "Martel," who was identified earlier in the investigation from previously intercepted phone calls. The call is partially transcribed below:

> **[BEGINNING OF CALL]**
> **[TELEPHONE RINGS]**
> **[BEGINNING OF CONVERSATION]**
> **MONROY-CUADROS:** **What's going on, dude?**
> **SILLER:** **Dude, if you want you can call the lady, so the women can go and take their photos by the little house of the dog.**
> **MONROY-CUADROS:** **Let me call my lady dude, because, I'm not sure if the woman is there, I mean, I'm not sure if someone is there to give it, dude.**
> **SILLER:** **Oh, alright, then dude.**
> **MONROY-CUADROS:** **I, I will let you know dude, alright.**
> **SILLER:** **Yeah, that's fine.**

[SOCIAL CONVERSATION]
[END OF CONVERSATION]
[END OF CALL]

53. At approximately 5:12 p.m., MONROY-CUADROS placed an outgoing call to

SILLER. The call is transcribed below:

[BEGINNING OF CONVERSATION]
SILLER: Hey.
MONROY-CUADROS: What's up, dude?
SILLER:     What's up, dude?
MONROY-CUADROS:     Dude, I had to leave for an emergency, I had to
run some errands, but I think that we will go, as soon as my woman to call
that lady, that girl, from the little house, to see what time she is available, and
in a hurry we can go.
SILLER:     Alright, no problem.
MONROY-CUADROS:     Huh?
SILLER:     I said, "Alright, no problem."
MONROY-CUADROS: Yeah, either way, I bought some champagne, dude.
SILLER:     Oh my, really, what are you thinking, that I don't work
tomorrow, or what?
MONROY-CUADROS:     No dude, the thing is we need to make a toast.
SILLER:     [CHUCKLES] You're crazy. [CHUCKLES]
MONROY-CUADROS:     Yeah, dude, so I have the courage, you know, the
project.
SILLER:     Alright, can't complain. [CHUCKLES]
MONROY-CUADROS:     But, if you don't want to, no problem, dude, no, I
mean, I don't want you to, you now… [CHUCKLES]
SILLER:     Yeah, well [U/I].
MONROY-CUADROS:     It's set, dude.
[VOICES OVERLAP]
SILLER:     What time are you returning dude. [PAUSE]  I'll call you.
[END OF CONVERSATION]
[END OF CALL]

Following this call, GPS tracker data indicated that MONROY-CUADROS' black

BMW travelled from Mercy Hospital in Mack, Ohio, to his home at **5774 Gilmore**

**Drive**, and then to the area of 1913 Westmont Lane, Cincinnati, Ohio. This address is

known to be the residence of Johnathan Siller, the brother of Joanh SILLER. At

approximately 5:42 p.m. agents observed the BMW parked in front of 1913 Westmont

and a red Mustang belonging to Johnathan parked in front of 1914 Westmont. At approximately 6:00 p.m., agents observed MONROY-CUADROS and Joanh SILLER exit 1913 Westmont Lane and walked to the BMW. MONROY-CUADROS looked around the parking lot, retrieved a white plastic bag from the trunk of the BMW and handed it to SILLER. Agents noted that the bag appeared to contain an object approximately the size of a book. SILLER immediately walked back into 1913 Westmont, and MONROY-CUADROS departed the area. GPS surveillance indicated that MONROY-CUADROS travelled back to **5774 Gilmore Drive**.

54. During the calls above, I believe that MONROY-CUADROS was attempting to arrange a sale of narcotics to Joanh SILLER. Based on my training and experience, I know that "dog" is a common slang term for heroin. I believe that Joanh SILLER was informing MONROY-CUADROS that he was ready to accept a quantity of narcotics ("Dude, if you want you can call the lady, so the women can go and take their photos by the little house of the dog"). MONROY-CUADROS stated he needed to ensure that someone was available at a stash location to provide the narcotics ("I'm not sure if the woman is there, I mean, I'm not sure if someone is there to give it, dude"). During the second call, I believe that MONROY-CUADROS states that he bought champagne for a toast to celebrate their sale. Based on the intercepted calls and surveillance above, I believe that MONROY-CUADROS supplied SILLER with a quantity of narcotics.

55. On January 3, 2018, at approximately 5:32 pm., agents intercepted a phone call between MONROY-CUADROS and SILLER. During the call, the following exchange took place:

**MONROY-CUADROS: What's up buddy, sorry, I was talking on the phone.**
**SILLER: Oh well, no, dude, I was around here by your house dude, the thing is I was going to give you something about the dog dude.**
**MONROY-CUADROS: Oh yeah, dude, I'm here arriving at the house dude.**

56. At approximately 6:18 p.m., agents established surveillance near **5774 Gilmore Drive**. Agents observed a gold Dodge truck bearing Ohio registration HDH3093 parked in front of the residence. This vehicle is registered to Joanh Siller at 22 Kelly Street, Liberty Township, Ohio. At approximately 6:40 p.m., agents observed an individual exit the house, get into the truck and depart. Agents maintained surveillance and followed the vehicle to 22 Kelly Street.

57. As stated above, I know that "dog" is a common reference to heroin. I believe that SILLER went to MONROY-CUADROS' house in order to pay him for the narcotics that he purchased on December 21, 2017.

58. On January 4, 2018, agents conducted a spot check of 22 Kelly Street and observed parked in the driveway a 2008 black Jeep SUV bearing Ohio registration GYQ3062, registered to Joanh Martel SILLER with a listed address of 22 Kelly Street, Liberty Township, Ohio, 45011.

59. On January 9, 2017, agents established surveillance at 5774 Gilmore. At approximately 4:56 p.m., agents observed MONROY-CUADROS exit the residence and start his black BMW bearing Ohio registration CHIRGA1. MONROY-CUADROS then reentered the residence. Approximately three minutes later, MONROY-CUADROS exited again, carrying an orange duffel bag and a white plastic bag which appeared to contain a block-shaped object. MONROY-CUADROS placed both bags into the BMW. At the same time, Omar SANTOS pulled in front of the residence in his black Ford hatchback. (Note: at approximately 4:55 p.m., GPS

data on SANTOS' phone indicated that it was located in the parking lot of the Meijer store mentioned below, having travelled there from **2850 Oxford-Trenton**). The parties greeted each other in the driveway for approximately two minutes, then each entered their respective vehicles and departed. Agents followed the black BMW to the Meijer located at 6325 South Gilmore Road, Fairfield, Ohio, where it arrived at 5:07 p.m. Agents observed MONROY-CUADROS driving around the parking lot, looking around as if he were attempting to locate something. Agents also observed MONROY-CUADROS was using the telephone; however, no calls were intercepted over Target Cellphone 2 at this time.

60. At approximately 5:22 p.m., agents observed MONROY-CUADROS park adjacent to a gray Dodge Caravan bearing Michigan registration DSB1010. Agents then observed MONROY-CUADROS exit the BMW while carrying a white plastic bag and enter the front passenger seat of the Caravan. Agents observed that MONROY-CUADROS and the driver of the Caravan, later identified as Yusef COHEN-TAWIL, appeared to be looking at an item on the floor of the Caravan. At approximately 5:35 p.m., agents observed MONROY-CUADOS exit the Caravan, enter the BMW and depart the area. Agents noted that when MONROY-CUADROS exited the Caravan, his left hand was empty and his right hand was in his pocket. Agents then intercepted a call over Target Cellphone 2 in which MONROY-CUADROS informed REYES-VALDES that he was on the way home.

61. At approximately 5:27 p.m., agents observed COHEN-TAWIL exit the Caravan and enter the Meijer. While he was in the store, agents observed a female, later identified as Ruth COHEN-TAWIL inside the Caravan with a small child. At approximately

5:49 p.m., agents observed Yusuf COHEN-TAWIL exit the Meijer carrying a gallon of water and bottle of Coca Cola. Yusuf entered the driver's door of the Caravan, and at approximately 5:53 p.m., Ruth exited the Caravan and entered the store, exiting and going back into the Caravan at approximately 6:09 p.m. At approximately 6:11 p.m., Yusuf exited the Caravan and went back into the store. At approximately 6:18 p.m., agents observed Yusuf exit the store and go back to the Caravan. After approximately 8 minutes, the Caravan pulled out of the parking spot and exited the parking lot. Agents maintained surveillance until a wall-off stop could be initiated by Ohio State Highway patrol troopers at approximately 6:26 p.m.

62. Pursuant to the stop, an open air sniff of the Caravan was conducted by a K9 officer. The K9 did not indicate to the presence of narcotics; however, Ruth COHEN-TAWIL was observed attempting to conceal some documents. Troopers observed that these documents were bank deposit receipts totaling nearly $36,000 for a Bank of America account. The COHEN-TAWIL'S then gave consent for troopers to search the Caravan. Troopers located $132,446 in the vehicle in three separate locations. Over $50,000 of this currency was located in a plastic bag underneath the front passenger seat. This plastic bag was similar in appearance to the one that MONROY-CUADROS was seen handling.

63. A review of the surveillance footage of the Meijer parking lot prior to the meeting between MONROY-CUADROS and COHEN-TAWIL showed the black Ford Focus hatchback known to be used by SANTOS circling the lot prior to his arrival at **5774 Gilmore**. Based on my training and experience, I know that drug traffickers will utilize counter-surveillance in order to avoid detection by law enforcement

64. Based on my training and experience, I know that brief meetings such as the one described above is conduct common to drug traffickers. I also know that drug traffickers frequently move bulk amounts of U.S. Currency in order to facilitate their drug trafficking activities. I believe that SANTOS conducted counter-surveillance in the parking lot of the Meijer prior to meeting MONROY-CUADROS, after which MONROY-CUADROS dropped U.S. Currency off to COHEN-TAWIL in order for it to be eventually deposited and laundered.

65. Based on the money seizure described in paragraphs 52-55, I believe that MONROY-CUADROS (and REYES-VALDES) utilize **5774 Gilmore Drive, Fairfield, Ohio** in furtherance of the illegal activities of the DTO. Additionally, since neither MONROY-CUADROS nor REYES-VALDES appear to have any regular employment or legitimate income, I believe that drugs and the proceeds of their drug trafficking activities will be found there.

## **Subject Location: 2850 Oxford -Trenton**

66. On December 29, 2017, agents intercepted the following phone call between MONROY-CUADROS and Omar SANTOS, who was previously identified in the investigation. The call is transcribed below:

> **[BEGINNING OF CONVERSATION]**
> **[SOCIAL CONVERSATION]**
> **[END OF SOCIAL CONVERSATION]**
> **[BEGINNING OF PERTINENT CONVERSATION]**
> **MONROY-CUADROS: Hey buddy, did your relative call you already?**
> **SANTOS:      [CHUCKLES] [U/I]**
> **[VOICES OVERLAP]**
> **MONROY-CUADROS: Fucking guy. The thing is that, do...**
> **[VOICES OVERLAP]**
> **SANTOS:      [U/I]**
> **MONROY-CUADROS:      ...You remember the [U/I] that didn't have any plates? The [U/I] car that we have there? [PAUSE] [U/I] [PAUSE] uh-huh,**

remember the...

[VOICES OVERLAP]

SANTOS:     [U/I] whole.

MONROY-CUADROS:     [U/I] the first one. So then we might have to turn it in but he said that you couldn't right? Until tomorrow.

[VOICES OVERLAP]

SANTOS:     Uh-huh. [PAUSE] [U/I] I work.

[VOICES OVERLAP]

MONROY-CUADROS:     Uh-huh, that is what he explained to me but I told him that what is urgent is that he gives me a key to see if, if it's compatible with their. Do you understand, how so? If it is compatible then I will tell him to wait until tomorrow, man. What time do you get out tomorrow?

SANTOS:     Uh-huh.

[PAUSE]

MONROY-CUADROS:     Enjoy your meal.

[PAUSE]

SANTOS:     [BURPS] No, well if snow falls, man, I'm going to have to work but the thing is early. I'm going to check my, my hum... [U/I]

[VOICES OVERLAP]

MONROY-CUADROS: Uh-huh.

SANTOS:     ...I want to see how it's going to be early tomorrow but if it can [U/I] in the morning.

[VOICES OVERLAP]

MONROY-CUADROS:     Yes, yes, yes, there is not time.

[VOICES OVERLAP]

SANTOS:     Because you know that snow falls in the afternoon, man. [CLEARS THROAT] But can it be from the... the... that little car that, that, that...

[VOICES OVERLAP]

MONROY-CUADROS:     No, no, no.

SANTOS:     ...The one with the whole motor.

[VOICES OVERLAP]

MONROY-CUADROS:     Well I don't remember how that one is but it's a small one. Do you remember? On the first week when the first one arrived. [PAUSE] Uh-huh. Okay...

[VOICES OVERLAP]

SANTOS:     The one that [U/I]... Oh the [U/I]

[VOICES OVERLAP]

MONROY-CUADROS:     ...I need the key to that one, man. [PAUSE] Uh... [PAUSE] Exactly, that one, that one.

[VOICES OVERLAP]

SANTOS:     [U/I] the "piedra" (stone) one?

MONROY-CUADROS:     So, I need a key to see if it will be compatible with their car and then fucking right away tell them that tomorrow... let me know if you can in the morning or in the afternoon, whatever is easiest for

you. The time to turn it in, is no problem. The only, the only thing that is
urgent for me right now...
[VOICES OVERLAP]
SANTOS:      Uh-huh.
MONROY-CUADROS: ...Is the key but he told me to go before four (4:00)
but I don't have time to get there because I have to go pick up my, my wife
but I wanted to ask you if you could do me that, that favor of...
[VOICES OVERLAP]
SANTOS:      Uh-huh.
MONROY-CUADROS: ...Taking out the key and leaving it there... I don't
know, in the tire of the fucking... trailer man, you know what I mean?
[PAUSE] or underneath your mat or somewhere there in a [U/I]
[PAUSE]
SANTOS:      Hum...
[VOICES OVERLAP]
MONROY-CUADROS: ...Let me know where man because I have to go
renew my license man, honestly.   I don't want to be driving [STAMMERS]
with my license like that man because they are, they are going to let me do it
now. [PAUSE] and then...
[VOICES OVERLAP]
SANTOS:      ...Okay I will check right now [U/I]... [U/I]
MONROY-CUADROS: ... I'm going to find that damn dude there [U/I]
[VOICES OVERLAP]
SANTOS:      [CHUCKLES]
MONROY-CUADROS:      So if you can do me that favor, man of taking it
out and let me know where you are going to leave it.
[PAUSE]
SANTOS:      It's uh...
[VOICES OVERLAP]
MONROY-CUADROS:      Yes, just let me know where man and I, I will...
[VOICES OVERLAP]
SANTOS:          [U/I]
MONROY-CUADROS: ...Pass for it and [U/I] when I'm over there I will
send you a text. "Hey, I already picked it up." [PAUSE] Alright buddy,
thank you and get better man.
SANTOS:      Alright then.
[VOICES OVERLAP]
MONROY-CUADROS: Alright.
[PAUSE]
SANTOS:      Alright. Alright, thank you. It's fine.
[END OF CONVERSATION]
[END OF CALL]

67. At approximately 2:15 p.m., agents intercepted another phone call between

MONROY-CUADROS and SANTOS. The call is transcribed below:

[BEGINNING OF CONVERSATION]
MONROY-CUADROS:  Hello. [PAUSE] Good afternoon, pharmacy?
SANTOS:[U/I] [CHUCKLES]
MONROY-CUADROS: [CHUCKLES]
SANTOS:     Do you know where the gas tank cover is at, man?
MONROY-CUADROS: To which one, man?
SANTOS:     The 300 one.
MONROY-CUADROS: No, no, are you leaving it in the cover?
SANTOS:     Uh-huh, it will be in there, well you need to open it like...
MONROY-CUADROS: Yeah like you are going to put gas in it, right?
SANTOS:     ...[U/I] no, I don't think so you can open it with your finger. It's open.
MONROY-CUADROS: Okay, so like you are going to put gas?
SANTOS:     Exactly. Right there.
MONROY-CUADROS: Okay, alright buddy. It's set. I will let you know as soon as I'm going over there.
SANTOS: Alright.
MONROY-CUADROS:     Alright bye.
SANTOS:     Alright.
[END OF CONVERSATION]
[END OF CALL]

68. At approximately 3:39 p.m., agents observed MONROY-CUADROS and Annel REYES-VALDES exit **5774 Gilmore Drive**, enter MONROY-CUADROS' red 2015 Dodge Ram, and depart. At this time surveillance followed the Dodge northbound on Dixie Highway (SR 4), arriving at the State of Ohio BMV (hereinafter "BMV") located at 1720 South Erie Blvd., Suite A, Hamilton, Ohio, at approximately 3:50 p.m.

69. At approximately 4:32 p.m., agents intercepted a phone call between MONROY-CUADROS and Felix GARCIA-ROSAS. The call is transcribed below:

> [BEGINNING OF CALL]
> [BEGINNING OF CONVERSATION]
> GARCIA-ROSAS:  And then?
> MONROY-CUADROS: Hey forgive me, you got me in the middle, in the middle of getting my license. [CHUCKLES]
> GARCIA-ROSAS: [CHUCKLES] Oh fuck! Oh well…
> [VOICES OVERLAP]
> MONROY-CUADROS: I'm here at the DMV in Hamilton, [U/I].

GARCIA-ROSAS: The one in Hamilton?

MONROY-CAUDROS: Uh-huh.

GARCIA-ROSAS: Yeah, but going to your house?

MONROY-CUADROS: What was that?

GARCIA-ROSAS: Uh, what time are you going to be at your house?

MONROY-CUADROS: I think that I will be there in like, uh, two (2) hours.

GARCIA-ROSAS: Asshole!

MONROY-CUADROS: Yeah, because, I am going to Oxford [PH] and then going to return.

GARCIA-ROSAS: And you say that the DMV in Hamilton is off the four (route 4)?

MONROY-CUADROS: Yes, it's the one next to, well, in front of Valle Verde around there.

GARCIA-ROSAS: Oh, yes, yes, yes, it's on your right side. Like it's…

[VOICES OVERLAP]

MONROY-CAUDROS: Uh-huh, on your…

[VOICES OVERLAP]

GARCIA-ROSAS: Like you're going to…

[VOICES OVERLAP]

MONROY-CUADROS: Right hand side, uh-huh.

GARCIA-ROSAS: Alright.

MONROY-CUADROS: Or do you want me to see you here? I will come out of here in fifteen (15) minutes.

GARCIA-ROSAS: Oh.

MONROY-CUADROS: Or you can go later on, you can go to the house later on, even though it is late.

GARCIA-ROSAS: The thing is that right now, I don't want to go out. Look, if you want, I can come by there in a little bit. I was going to [U/I] for an errand and then that's it.

MONROY-CUADROS: Like how long will it be until you come by here?

GARCIA-ROSAS: In like, in like fifteen (15) minutes.

MONROY-CAUDROS: Alright, alright, if I beat you, I will wait for you for a little bit. Go ahead and stop then.

GARCIA-ROSAS: Alright then.

MONROY-CUADROS: Alright.

GARCIA-ROSAS: Alright.

[END OF CONVERSATION]

[END OF CALL]

70. At approximately 4:53 p.m., agents observed GARCIA-ROSAS' 2010 red Dodge arrive at the BMV located at 1720 South Erie Blvd., Suite A, Hamilton, Ohio, 45011. At that time MONROY-CUADROS and REYES were still inside the BMV. At approximately 4:53 p.m., agents observed GARCIA-ROSAS park adjacent

25

to the MONROY-CUADROS' Dodge and exit his vehicle wearing an orange sweatshirt and blue jeans, then enter the BMV. At approximately 4:54 p.m., GARCIA-ROSAS exited the BMV and returned to the vehicles. At approximately 4:55 p.m., agents observed MONROY-CUADROS and REYES-VALDES exit the BMV carrying a small child, greet GARCIA-ROSAS, and then all three entered MONROY-CUADROS' Dodge. At approximately 4:59 p.m., agents observed GARCIA-ROSAS exit MONROY-CUADROS' Dodge and depart the area in his own vehicle. At approximately 5:00 p.m., agents observed MONROY-CUADROS' Dodge depart northbound on Dixie Highway (SR 4).

71. At approximately 5:26 p.m., agents observed the MONROY-CUADROS' Dodge arrive at **2850 Oxford Trenton**, whereupon it traveled down the gravel driveway from the road toward the farm buildings. At approximately 5:35 p.m., agents conducted a drive-by and observed the Dodge parked on the driveway, facing Oxford Trenton Road. MONROY-CUADROS was in the bed of the truck and appeared to be manipulating something. At approximately 5:39 p.m., agents observed MONROY-CUADROS driving on Oxford Trenton Road back toward Hamilton, Ohio.

72. Based on previously intercepted calls in this investigation, I believe that "keys" is a reference to samples of narcotics. For example, when agents conducted a controlled meeting between CS-1 and GONZALEZ-ROSAS on October 25, 2017, GONZALEZ-ROSAS provided CS-1 with approximately 1 gram of heroin. Prior to that meeting, GONZALEZ-ROSAS requested a "key to the truck" from the person whom he obtained the sample from, and was then observed meeting with that individual prior to the controlled meeting. Due to this, I know that the DTO used the

term "key" when referring to samples of narcotics. During the call transcribed above, I believe that MONROY-CUADROS was telling SANTOS that he needed to give a sample of narcotics to a customer, and if it was satisfactory ("compatible") the customer would purchase a larger amount the following day.

73. On December 30, 2017, at approximately 8:00 a.m., agents established surveillance at **5774 Gilmore Drive**. At approximately 12:33 p.m., agents intercepted a call between MONROY-CUADROS and SANTOS. The call is partially transcribed below:

**[BEGINNING OF CONVERSATION]**
**[SOCIAL CONVERSATION]**
**[END OF SOCIAL CONVERSATION]**
**[BEGINNING OF PERTINENT CONVERSATION]**
**MONROY-CUADROS:**      **I was calling just to tell you that the little car did take off with that key so then hum... I just wanted to ask you what time you can do it today in the afternoon?**
**[VOICES OVERLAP]**
**SANTOS: You already saw [U/I] man?**
**MONROY-CUADROS: Yeah man it's just that it I forgot to let you know.  I was about to let you know but then a call came in when I was there and then one thing        and another and it slipped.   Hum... just to as you... because they are asking me what time it would be... what time you could hum... take it to the tow truck.**
**[PAUSE]**
**SANTOS: And hum... where would you think...**
**[VOICES OVERLAP]**
**MONROY-CUADROS: Well hum...**
**SANTOS: ... [U/I] you think?**
**MONROY-CUADROS: Well where ever you say.  Where? Where? By...**
**[PAUSE] if you want there in...[PAUSE] "where would it be good?"**
**[PAUSE] Hum...**
**[PAUSE]**
**SANTOS: [U/I]**
**MONROY-CUADROS: No man, so you can turn it in to the... [PAUSE] the same one as always... the one like the color of your car.**
**[PAUSE]**
**SANTOS: Yellow?**
**MONROY-CUADROS: [STAMMERS] No... the one... the color of your car man.  [PAUSE] the one you used to see before.**
**[PAUSE]**
**SANTOS: Huh?**

MONROY-CUADROS: I said, the one you used to see before.

SANTOS: Oh... the big one? [CHUCKLES]

MONROY-CUADROS: Oh yeah my love. [CHUCKLES]

SANTOS: [CHUCKLES] Oh my, my.

MONROY-CUADROS: [CHUCKLES] Gay.

SANTOS: [CHUCKLES] yes.

MONROY-CUADROS: Well I just wanted to know the hour and what would be a good place? There at the "M" in...

[VOICES OVERLAP]

SANTOS: Hum...

MONROY-CUADROS: ...[U/I] where ever you tell me.

[PAUSE]

SANTOS: Hum... [PAUSE] Thee in the... where would be good? There in the "cafe", right?

MONROY-CUADROS: Well the "M" is still in front, right?

SANTOS: Well yeah [U/I]

MONROY-CUADROS: Alright then. So then at what time, man?

[PAUSE]

SANTOS: At the "cafe" hum... [PAUSE] no, well right now I'm... snow is not falling anymore, right? The sun already came up?

[VOICES OVERLAP]

MONROY-CUADROS: Honestly, I'm barely waking up because because my kid fell asleep until six (6:00), man.

[PAUSE]

SANTOS: Uh?

MONROY-CUADROS: I'm barely waking up because my kid fell asleep until six (6:00).

SANTOS: Really?

MONROY-CUADROS: Yes man. So then, what time? One (1:00)...

[VOICES OVERLAP]

SANTOS: Right now, twelve, thirty (12:30).

MONROY-CUADROS: ...It's about to be one (1:00). So... well since i had told ,him in the afternoon, I'm going to ask him if he can, if he can right now or until the afternoon. I'll as him. [U/I] I...

[VOICES OVERLAP]

SANTOS: [U/I] the call.

MONROY-CUADROS: ...since I thought you were working.

SANTOS: I can't hear you very well, the line is cutting off. I hear your voice cutting off.

MONROY-CUADROS: Let me see, can you hear me?

SANTOS: Let me see... hum... hum... so [U/I] do you think he could have time right now, man? So I can go right now, I'll, I'll just shower and change. It's twelve, thirty (12:30) [SNIFFS] right now. [PAUSE] Hum...

[VOICES OVERLAP]

MONROY-CUADROS: Hold on.

[PAUSE]

**SANTOS: Twelve, thirty (12:30)... one (1:00)/ [PAUSE] [CLEARS THROAT] TWO, THIRTY (2:30).**
**[VOICES OVERLAP]**
**MONROY-CUADROS: I thought... since I thought you were working, I said, I, I told him at six (6:00) but I'll tell him right now like two, thirty (2:30) or three (3:00), don't you think?**
**SANTOS: Tell him at three (3:00), man.**
**MONROY-CUADROS: So you won't be in a rush.**
**[PAUSE]**
**SANTOS: Tell him at three (3:00) so... I can have a coffee.  Right now [U/I]**
**MONROY-CUADROS: Okay bye.  I'll...**
**[VOICES OVERLAP]**
**SANTOS: Bye.**
**MONROY-CUADROS: ...I'll let you know right now.**
**[END OF CONVERSATION]**
**[END OF CALL]**

74. At approximately 12:43 p.m., agents intercepted the following call from MONROY-

CUADROS to SANTOS. The call is partially transcribed below:

**[TELEPHONE RINGS]**
**[BEGINNING OF CONVERSATION]**
**SANTOS: [COUGHS] What's going on, buddy?**
**MONROY-CUADROS: Buddy, I sent you a message but I'm confirming the appointment at three (3:00).**
**[PAUSE]**
**SANTOS: Three (3:00)? Okay.**
**[VOICES OVERLAP]**
**MONROY-CUADROS: By two (2) cappuccinos.**
**[SOCIAL CONVERSATION]**
**[END OF CALL]**

75. At approximately 1:00 p.m., agents established surveillance at **2850 Oxford Trenton**.

At approximately 2:03 p.m., agents observed a black Ford Focus hatchback pull out

of the driveway. Agents later determined that the driver of this vehicle was SANTOS.

76. Surveillance was maintained as SANTOS travelled to the Thornton's gas station at

6347 Dixie Highway in Fairfield, Ohio. SANTOS parked near the gas pumps and

entered the store. He emerged momentarily afterward and pumped gas into the Ford.

77. Surveillance units then followed SANTOS to the Carniceria La Preferida Market at 5951 Boymel Drive. SANTOS parked his car and entered the store. He emerged 10 minutes later, entered his car and departed.

78. At approximately 2:52 p.m., agents intercepted a call from MONROY-CUADROS to SANTOS. The call is partially transcribed below:

> **[BEGINNING OF CONVERSATION]**
> **[SANTOS INFORMS MONROY-CUADROS HE NEEDED GAS AND IS 10 MINUTES AWAY]**
> **SANTOS: So then I just turn the car key to that guy and that's it and the guy can take care of everything or is he going to turn in a deposit for...**
> **[VOICES OVERLAP]**
> **MONROY-CUADROS: [STAMMERS] No.**
> **SANTOS: ...[U/I]**
> **MONROY-CUADROS: I don't think so. He hasn't told me, he hasn't told me but I don't think so and in case that...**
> **[VOICES OVERLAP]**
> **SANTOS: Okay.**
> **MONROY-CUADROS: ...[U/I] then I will meet you around.**
> **SANTOS: In case it's something well then...**
> **[VOICES OVERLAP]**
> **MONROY-CUADROS: Uh-huh.**
> **SANTOS: [U/I] [CHUCKLES]**
> **MONROY-CUADROS: Uh-huh because you know... for sure [CHUCKLES]**
> **[VOICES OVERLAP]**
> **SANTOS: [CHUCKLES]**
> **MONROY-CUADROS: It's set buddy.**
> **[VOICES OVERLAP]**
> **SANTOS: [U/I] alright we will be in touch then.**
> **MONROY-CUADROS: Alright.**
> **SANTOS: Alright.**
> **[END OF CONVERSATION]**
> **[END OF CALL]**

79. At approximately 3:00 p.m., agents observed SANTOS pull into the parking lot of the Chipotle located at 11700 Princeton Pike in Springdale, Ohio. SANTOS parked the car and remained inside. (Note: this Chipotle is located next to a Starbucks and across

from a McDonald's restaurant). Agents noted that SANTOS appeared to be looking around as if he was waiting for someone.

80. At approximately 3:06 p.m., agents observed a black male, later identified as Anthony PHILLIPS, approach SANTOS' vehicle from the direction of the BJ's restaurant located adjacent from the Chipotle. PHILLIPS got into SANTOS' vehicle. SANTOS pulled out of the parking spot, drove towards the BJ's restaurant, and parked in a parking space. PHILLIPS exited the vehicle and walked back into the restaurant. SANTOS then pulled out and departed the area.

81. Approximately 2 minutes later, PHILLIPS exited BJ's and entered a maroon GMC Sierra pickup bearing Ohio registration HDY 5889. PHILLIPS drove through the parking lot and exited the mall parking lot at Kemper Road. Surveillance units lost visual of PHILLIPS as he continued west on Kemper Road through Springfield Pike.

82. At approximately 3:10 p.m., agents intercepted a phone call between MONROY-CUADROS and SANTOS. The call is transcribed below:

> **[BEGINNING OF CONVERSATION]**
> **MONROY-CUADROS: Hello?**
> **SANTOS: Woman?**
> **MONROY-CUADROS: Woman.**
> **[VOICES OVERLAP]**
> **OMAR: Hum... he said he was going to give me two hundred (200) bucks but he said that he forgot them. [LAUGHS]**
> **MONROY-CUADROS:     Say what man?**
> **SANTOS: He was going to give me two hundred (200), two hundred (200) bucks but he forgot them. [LAUGHS]**
> **MONROY-CUADROS: [LAUGHS] one thousand two hundred (1,200).**
> **[VOICES OVERLAP]**
> **SANTOS: I told him leave it like that. Two hundred (200), he said. [PAUSE] I said...**
> **[VOICES OVERLAP]**
> **MONROY-CUADROS: Oh.**
> **SANTOS: ...Leave it like that. Drink some coffee. [CHUCKLES]**
> **MONROY-CUADROS: For sure. You can keep them buddy.**

**SANTOS: Huh?**
**MONROY-CUADROS: I said you can keep them.**
**SANTOS: [CHUCKLES] Alright man. It's set, man.**
**MONROY-CUADROS: Alright then buddy, it's set.**
**SANTOS: Yeah hum... we will talk later to see what's going on.**
**MONROY-CUADROS: [COUGHS] for sure man. I'm talking low because**
**my kid is sleeping.**
**SANTOS: [SCREAMS] [LAUGHS]**
**MONROY-CUADROS: [MUMBLES]**
**[VOICES OVERLAP]**
**SANTOS: Alright then.**
**[VOICES OVERLAP]**
**MONROY-CUADROS: [U/I] alright. Alright man, thank you, MAN.**
**SANTOS: Huh?**
**[END OF CONVERSATION]**
**[END OF CALL]**

83. At approximately 3:25 p.m., officers with Springdale Police observed PHILLIPS' vehicle parked near the Hobby Lobby located at 11711 Princeton Pike. The vehicle was unoccupied.

84. Based on my training and experience, I know that short meetings carried out inside vehicles are conduct common to drug trafficking, particularly under the circumstances related above.

85. Based on the surveillance and calls listed above, as well as previously observed activity of MONROY-CUADROS, GARCIA-ROSAS, and others in this investigation, I believe that MONROY-CUADROS supplied PHILLIPS with a sample of heroin on December 29, 2017. I believe that on December 30th, 2017, MONROY-CUADROS instructed SANTOS to deliver a larger amount to PHILLIPS. I believe when he was on the way to the meeting, SANTOS asked MONROY-CUADROS if PHILLIPS was supposed to give him money; MONROY-CUADROS said he did not think so but if he did MONROY-CUADROS would collect it from SANTOS later. I believe that PHILLIPS owed a balance of $200 for the transaction,

and that SANTOS told him to not worry about it. Due to surveillance conducted during this time, I believe that SANTOS obtained the drugs from his residence at **2850 Oxford-Trenton Road**.

86. Social media checks used to identify SANTOS display a picture of him holding a shotgun, as well as other pictures displaying firearms.

87. On January 3, 2017, agents activated a GPS ping on SANTOS' cellular phone. Location data revealed that SANTOS' phone is frequently located at **2850 Oxford-Trenton Road**, to include overnight hours, indicating that **2850 Oxford-Trenton** is SANTOS' residence.

88. On January 23, 2018, agents intercepted a phone call between Armando REYES and MONROY-CUADROS. REYES had been identified from intercepted call previously in the investigation. During the call, REYES asked MONROY-CUADROS how much money he (REYES) owed MONROY-CUADROS. After determining the number, the following exchange took place:

> **REYES: Oh shit. Alright then, [MUMBLES] [U/I] to see what that buddy is going to do. If not, so you come get those, then. In case everything is fine, because right now, we will see what he is going to do. If there is something to be done or not. [U/I]**
> **[VOICES OVERLAP]**
> **MONROY-CUADROS: Where are you?**
> **REYES: Huh?**
> **MONROY-CUADROS: Where are you?**
> **REYES: Here at home.**
> **MONROY-CUADROS: Uh. Well, check that out. Well, you tell me. It is already late now, so for tomorrow better, dude, alright?**
> **REYES: Yes dude.**
> **MONROY-CUADROS: You came back alright, that is good, brother. [U/I]**

89. On January 24, MONROY-CUADROS and REYES spoke and agreed to meet. The call indicated that they would meet at REYES' residence. At approximately 6:00

p.m., agents observed MONROY-CUADROS leave his residence and travel to 2850 Oxford-Trenton, arriving at approximately 6:38 p.m. Later in the evening, a phone ping was activated on REYES' phone. The data obtained from this phone indicated that REYES stayed overnight at **2850 Oxford-Trenton,** and has stayed there nightly since.

90. On January 25, 2018, agents established surveillance near **2850 Oxford-Trenton.** At approximately 2:13 p.m., agents observed a blue Mazda leave the farm. The driver of this vehicle was later identified as REYES. Surveillance was maintained on the Mazda as it travelled to the Dillard's department store located at 7660 Bake Street, Liberty Township, Ohio, arriving at 2:47. REYES walked into the store. Surveillance units followed REYES into the store.

91. At approximately 2:44 p.m., agents observed MONROY-CUADROS enter his red Dodge pickup and depart his residence. MONROY-CUADROS arrived at the Dillard's at approximately 3:04 p.m. MONROY-CUADROS placed a phone call to REYES, during which REYES indicated that he was inside.

92. At approximately 3:05 p.m., REYES was observed entering the food court of the mall that the Dillard's is attached to. At approximately 3:11 p.m., agents observed MONROY-CUADROS enter the food court and sit down with REYES. At approximately 3:14, both individuals departed the area, going back to the Dillard's. After stopping to look at some items, they exited the store at approximately 3:17 p.m.

93. MONROY-CUADROS and REYES walked towards their vehicles and entered REYES' blue Mazda. MONROY-CUADROS sat in the passenger seat. Agents observed REYES and MONROY-CUADROS observing an item that was placed

between them.

94. At approximately 3:24 p.m., surveillance observed MONROY-CUADROS exit the Mazda and go back to his own vehicle. Agents observed that MONROY-CUADROS had an object in the right coat pocket that was inside a white plastic bag. MONROY-CUADROS entered his Dodge Ram and REYES departed the area in the Mazda. Surveillance was maintained on both vehicles.

95. At approximately 3:40 p.m., a Butler County Sherriff's K9 unit conducted a wall-off stop of MONROY-CUADROS. Following a positive indication by the K9, MONROY-CUADROS' vehicle was searched. Located in the center counsel was a plastic white bag containing a bulk amount of U.S. currency totaling $10,000. The currency was seized and MONROY-CUADROS was given a ticket for a moving violation.

96. Based on the surveillance of a suspected drug transaction listed in paragraph 73, and the money seizure in paragraph 88, I believe that the DTO utilizes **2850 Oxford Trenton** in furtherance of the illegal activities of the DTO by using it as a stash house in order to store drugs, drug proceeds, and firearms.

### Knowledge of Drug Trafficking Organizations

97. Based on my training and experience, I know the following:

   a.       drug traffickers often place assets in names other than their own to avoid detection of these assets by government and law enforcement agencies;

   b.       drug traffickers often place assets in names of business/corporate entities as nominee title holders in order to avoid detection of these assets by government and law enforcement agencies; even though these assets are placed in the names

of other persons or entities, the drug traffickers continue to use these assets and exercise dominion and control over them;

c.      drug traffickers must maintain and/or have quick access to large amounts of United States currency or other liquid assets in order to maintain and finance their ongoing drug business;

d.      drug traffickers often maintain money counting machines, money wrappers and rubber bands, boxes, bags, brief cases, suitcases, or containers used to carry drug proceeds and/or controlled substances;

e.      drug traffickers often maintain in their residences and/or business establishments records relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed including some or all of the following written books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers (i.e. bank account records, wire transfer records, bank statements, safe deposit box keys and records, money wrappers, rubber bands, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the illegal sale of drugs);

f.      drug traffickers commonly use cellular phones to communicate with other members of the DTO, narcotics source of supply(s), and/or narcotics customers in furtherance of violations of the Controlled Substances Act;

g.      drug traffickers commonly provide illegal narcotics to their organization on consignment sale to their customers, who subsequently pay for the drugs after

reselling said drugs. Therefore, the above-mentioned books, records, receipts, notes, ledgers, etc., will be secured by the drug traffickers within their residences and/or their businesses for their ready access for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

h.      drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone numbers of drug associates within their residence and/or place of business, their business vehicles, or the curtilage of their residence or business for ready access and to hide them from law enforcement agencies;

i.      drug traffickers commonly will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services (i.e., safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts), and evidence of this includes documents like stock certificates, bonds, deposit certificates, and travelers checks;

j.      drug traffickers often have photographs or video movies of themselves, their co-conspirators and the property and assets purchased with drug proceeds. These photographs and video movies are normally in the drug traffickers possession, their residence and/or their place of business;

k.      drug traffickers' methods of transporting drugs include but are not limited to: commercial airlines, private motor vehicles, and government and contract mail carriers. I know that the vehicles, residences, or business locations of drug

traffickers will often contain records of drug-related travel. These records may include airline ticket receipts, credit card receipts, traveler vouchers, hotel and restaurant receipts, photographs, canceled checks, maps, and written directions to locations rental car receipts and luggage tags reflecting points of travel;

l.      drug traffickers commonly have firearms in their possession (on their person, at their residence, and/or their business) including but not limited to handguns, rifles, shotguns and automatic weapons. These firearms are most often used and/or maintained in order to protect and secure a drug trafficker's property or manufacturing operation;

m.      it is common for drug traffickers to secrete in their vehicles items identified in the above paragraphs;

n.      drug traffickers will often accumulate and maintain substantial amounts of drug proceeds, specifically currency, over a period of years, so that the proceeds can be used in later years for personal asset acquisitions and/or expenditures during periods when a drug trafficker is not distributing drugs;

o.      drug traffickers commonly will maintain residence(s) separate from their primary residence to serve as "safe houses" where the traffickers may stay for periods of time; I know that these residences which may be occupied by other conspirators or associates may contain elements of the traffickers drug crimes to include all items noted above;

p.      drug traffickers commonly will maintain residence(s) separate from their primary residence to serve as "stash houses" where the traffickers may stay store drugs or drug proceeds; I know that these residences which may be occupied by

other conspirators or associates may contain elements of the traffickers drug crimes to include all items noted above;

q.    drug traffickers commonly have evidence of purchases of goods used in the manufacture of controlled substances secreted in their residences, businesses, or vehicles;

r.    drug traffickers commonly secret in their residences and/or places of business, over a period of years, items such as those identified in the above paragraphs.

98. I believe that the facts set forth in this affidavit support probable cause to believe that Armando GONZALEZ-ROSAS, Felix GARCIA-ROSAS, Miguel MONROY-CUADROS, and Omar SANTOS are engaged in a conspiracy to distribute heroin, in violation of Title 21 U.S.C. § 841(a)(1) and Title 21 U.S.C. § 846.

99. Based on the circumstances above, your Affiant has probable cause to believe that search warrants executed at the Subject Locations will reveal evidence of violations of Title 21 U.S.C. § 841(a)(1) and Title 21 U.S.C. § 846.   The reasons for probable cause are summarized below:

a.   Based on the physical surveillance, GPS data and utility records in paragraphs 12-40, I know that GONZALEZ-ROSAS lives at **1828 Augusta Boulevard**. During this investigation, agents have observed a suspected drug deal in which drugs were obtained from **1828 Augusta** on November 12, 2017. Additionally, agents conducted a controlled purchase of heroin from GONZALEZ-ROSAS on September 7, 2017. Because of these facts, I believe that based on paragraph 97, there is probable cause to believe that he, and evidence of drug trafficking are

likely to be located at the address. Based on my experience and training and the facts as set forth in this Affidavit, I believe that drugs and drug proceeds are likely located there.

b. Based on paragraphs 12-40, I know that GARCIA-ROSAS resides at **6580 Lakota Pointe Lane**. During this investigation, agents have conducted a controlled purchase of heroin that was facilitated by GARCIA-ROSAS on September 7, 2017, as well as observed GARCIA-ROSAS engage in travel patterns common to drug traffickers. Because of these facts, I believe that based on paragraph 97 there is probable cause that he, and evidence of drug trafficking are likely located there. Based on my experience and training and the facts as set forth in this Affidavit, I believe that drug proceeds and documents related to drug trafficking are likely located there.

c. Based paragraphs 41-65, I know that Miguel MONROY-CUADROS resides at **5774 Gilmore Drive**. During this investigation, agents have conducted two money seizures, one of which occurred directly from GONZALEZ-ROSAS on January 25, 2018. The other money seizure, during which over $130,000 was seized, occurred after MONROY-CUADROS left **5774 Gilmore** and met the money courier. MONROY-CUADROS is also suspected of directing a suspected drug deal between SANTOS and PHILLIPS on December 30. 2018. Because of these facts, I believe that based on paragraph 97 there is probable cause to believe that he, and evidence of drug trafficking are likely to be located at the address. Based on my experience and training and the facts as set forth in this Affidavit, I believe that drugs, drug proceeds and documents related to drug trafficking are

likely located there.

d. Based paragraphs 66-96, I believe that **2850 Oxford-Trenton Road** is the primary residence of Omar SANTOS and Armando REYES. Due to the suspected hand to hand drug transaction between SANTOS and PHILLIPS observed on December 30, 2017, and the seizure of bulk currency from MONROY-CUADROS on January 25, 2018, I believe that **2850 Oxford-Trenton Road** is being used as a drug and money stash house, and the seized money and distributed drugs are stored there. Based on electronic surveillance, I also believe that SANTOS conducted counter-surveillance prior to the seizure of over $130,000 bulk currency on January 9, 2018. Because of these facts, I believe that based on paragraph 97 there is probable cause to believe that they, and evidence of drug trafficking are likely to be located at the address. Based on my experience and training and the facts as set forth in this Affidavit, I believe that drugs, drug proceed, and firearms are likely located there.

100.   This warrant is intended to apply to the properties described above and in Attachments A, to include any separate buildings or structures, any vehicles located on the property, and any vehicles in the close vicinity of the property (for example, on the street curb) belonging to any individuals residing at the property.

## REQUEST FOR SEALING

101.   It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation into the criminal

organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Joseph J. Zevchek
Special Agent
Drug Enforcement Administration

Sworn before me, this *30* day
of January, 2018.

Karen Litkovitz
U.S. Magistrate Judge
Southern District of Ohio